# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| REUEL RAY, | § | No. 379, 2016 |
| | § | |
| Defendant Below- | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | |
| STATE OF DELAWARE, | § | ID No. 1210020570A |
| | § | |
| Plaintiff Below- | § | |
| Appellee. | § | |

Submitted: June 7, 2017
Decided: July 25, 2017

Before **STRINE**, Chief Justice; **VAUGHN** and **SEITZ**, Justices.

## ORDER

This 25th day of July, 2017, upon consideration of the parties' briefs, oral argument, and the record on appeal, it appears that:

(1) Appellant, Reuel Ray, appeals his convictions of Murder in the First Degree and related offenses. He makes two arguments on appeal. First, he contends that the Superior Court abused its discretion by failing to grant a mistrial. The second contention, as framed by Ray, is that the Superior Court denied his Sixth Amendment right to a fair trial by failing to give a contemporaneous cautionary instruction on the presumption of innocence and admonition to the jury to refrain from discussing the case prior to deliberations. For the reasons which follow, we reject Ray's contentions and affirm his convictions.

(2) Ray was found guilty of murdering Craig Melancon with a hand gun in the Southbridge area of Wilmington. A co-defendant, Tyare Lee, participated with Ray in the murder. Before trial, Lee pled guilty to Murder in the Second Degree and agreed to testify against Ray. According to Lee's testimony at Ray's trial, the two planned to rob Melancon. When they approached him, Melancon reached for his pocket. Ray and Lee then both fired their guns at Melancon, hitting him three times, causing his death. The State also presented the testimony of two witnesses who said that Ray admitted to them later that he shot Melancon.

(3) Ray was charged with two counts of Murder in the First Degree (one count of intentional murder and one count of felony murder), one count of Attempted Robbery in the First Degree, six counts of Possession of a Firearm During the Commission of a Felony ("PFDCF"), one count of Conspiracy in the Second Degree, one count of Possession of a Firearm by a Person Prohibited, and two counts of Criminal Solicitation in the Second Degree. The Person Prohibited charge was severed and not presented at trial. The jury acquitted Ray of the intentional murder count and two associated PFDCF charges. It convicted him of the felony murder charge and the other remaining charges. The State entered a *nolle prosequi* on two of the PFDCF charges at sentencing.

(4) At trial, an issue discussed among the prosecutor, defense counsel, and the trial judge was a concern on the part of the State that Ray and members of his

2

family were attempting to intimidate the State's witnesses. As a result of these discussions, the trial judge ruled that Ray's brother, Charles Ray, would not be permitted in the courtroom. In addition, a bailiff and a capitol policeman were stationed outside the courtroom to ascertain the identity of anyone entering the courtroom.

(5) On the fifth day of trial, while co-defendant Lee was on the witness stand testifying on direct examination, a spectator entered the courtroom. Upon observing the spectator, the prosecutor, apparently concerned about the person's identity, requested a side bar. At the side bar, defense counsel expressed concern that the sudden request for a side bar when the spectator entered made "it look like we brought this guy in to try to intimidate the witness."[1] The trial judge decided to take a short recess, mentioning to defense counsel that he could request a cautionary instruction if he wished to do so.

(6) After returning to the courtroom following the recess, the trial judge reported the following:

> The Court: So [defense counsel] any application that you have I would be happy to hear, but before you make that application, I need to disclose now that the jury has expressed concern for their safety and wants to know why the recess was taken when that man walked into the room.[2]

---

[1] App. to Appellant's Opening Br. at 160.
[2] *Id.*

Defense counsel then moved for a mistrial:

> Defense Counsel: I would make a motion for a mistrial at this point, because I don't see why it was necessary for the State to stop their direct examination immediately, after turning around and looking upon the entry of this witness who then sat down on defendant's side [of the courtroom], that was the inference I was concerned about when I came to sidebar. Alternatively we would ask the court to *voir dire* each juror at this point in time to determine whether or not they can fairly continue judging this defendant . . . This is not an easy case to defend in the first place. Now that we have this, the jury that's concerned, not a jury that is going to listen, the jury is concerned about their safety, not a jury that is going to be amenable to listening to arguments that he is not guilty.[3]

Defense counsel then asked "whether the inquiry [from the jury] was a collective inquiry, was it a concern expressed by one or more of the jurors."[4] The bailiff indicated that two jurors had expressed concerns about safety or security, Juror No. 11 and Alternate No. 3. Defense counsel then indicated that "if the mistrial is not granted on its face," the *voir dire* could be limited to the two jurors mentioned, at least initially, to inquire as to whether "their fears have been communicated to other jurors."[5]

The first juror examined was Juror No. 11. After being asked to express any concerns she had, she stated:

---

[3] *Id.* at 160-61.
[4] *Id.* at 161.
[5] *Id.*

4

Okay, so a lot of stopping and starting, a lot of stuff we don't understand. We come in yesterday from a break there is now two police officers standing there by the doors, no one there they let us on the freight elevator altogether then of course you know a murder trial today, someone walks in and we all stop again, we leave.[6]

When again asked to express her concerns, she responded:

I am confused. Did you ever see the juror Demi Moore, I know it sounds – this is a murder trial. Kind of wonder if I am going to get shot in my car, not like I am really think it is going to happen, I watch a lot of TV. In the back of my mind . . .[7]

The juror was then asked whether she had "discussed those concerns with anyone in the jury room."[8] The juror responded, "[h]e came in, I was asking him what is going on," an apparent reference to her asking the bailiff what was going on.[9] The juror was then asked whether she had any discussion "with any other jurors about any concerns that you might have."[10] She again responded "[j]ust the time he came in I asked him what was going on." Defense counsel asked the Court to inquire whether that occurred in the presence of the other jurors, and Juror No. 11 stated that it had. After further questions and answers, she was asked whether she could still be an

---

[6] *Id.* at 162.
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*

impartial juror. She responded "Yes, I believe that I don't mean none of my – I don't think that none of that changed."[11]

Her examination concluded with this exchange:

> The Court: So you in terms of what we discussed here, having officers in the courtroom, have you – are you able to view the evidence impartially at this time?
>
> Juror No. 11: Yes.
>
> The Court: Do you think that you would be more or less likely to find the defendant guilty or not guilty because of these concerns that you have expressed here?
>
> Juror No. 11: Yes.
>
> The Court: You will view the evidence as a whole impartially to make a determination at the end of the day?
>
> Juror No. 11: Yes.[12]

Alternate No. 3 was then examined. The following exchange took place.

> The Court: It has been suggested to us that you might have some safety concerns. Do you have any personal safety concern?
>
> Alternate No. 3: I don't have any safety concern but yes, I have noticed different things happening, and us being released at different times, and just hoping that they didn't relate. Like someone walking in to – the last person who walked in, all of a sudden we leave. Yesterday leaving on the elevator with two cops and then coming in yesterday afternoon they were standing there, being overly observant, that's all.

---

[11] Id.
[12] Id.

The Court: You have concerns?

Alternate No. 3: No, but I questioned why, that's all.

The Court: Tell me something, you have had any discussion with any of your fellow jurors about safety concerns?

Alternate No. 3: No, everybody has been kind of open and honest about it if, like, we all noticed the same thing.

The Court: Has there been a general discussion in the jury room about the presence of officers or frequency or recess or anything?

Alternate No. 3: Not that I was aware of, not that I heard.[13]

The alternate was then asked whether she could continue to be fair and impartial, to which she responded "No question."[14]

(7) The trial judge then stated that she was satisfied the jurors could be fair and impartial and denied the motion for a mistrial. When the trial resumed in the courtroom, the trial judge gave cautionary instructions concerning sequestration of witnesses, court recesses, objections, and court impartiality. The direct examination of Mr. Lee then resumed.

(8) Ray contends that the trial court abused its discretion by failing to order a mistrial following *voir dire* of the two jurors. When Juror No. 11's *voir dire* is taken

---

[13] *Id.* at 163.
[14] *Id.*

7

as a whole, he argues, especially, her comment about being shot "in her car,"[15] it shows that she had a fear for her personal safety that went beyond a generalized anxiety, a fear which impaired her ability to render an impartial, disinterested, objective judgement. He also points to her "Yes" answer when asked if she "would be more or less likely to find the defendant guilty or not guilty"[16] as further evidence of her lack of objectivity. He further argues that the responses of the two jurors show that the trial proceedings in the context of juror safety were being discussed among the entire jury. As a result, he argues, the failure to declare a mistrial denied him of his Sixth Amendment right to a fair and impartial panel of jurors.

(9) This Court reviews a "trial court's denial of a motion for a mistrial under an abuse of discretion standard."[17] "The trial judge is in the best position to assess whether a mistrial should be granted.[18] "A trial judge should grant a mistrial only where there is 'manifest necessity' or the 'ends of public justice would be otherwise defeated.'"[19] "A mistrial is mandated only when there are 'no meaningful and practical alternatives' to that remedy."[20]

---

[15] *Id.* at 162.
[16] *Id.*
[17] *MacDonald v. State*, 816 A.2d 750, 753 (Del. 2003).
[18] *Bowe v. State*, 514 A.2d 408, 410 (Del. 1986).
[19] *Steckel v. State*, 711 A.2d 5, 11 (Del. 1998) (quoting *Fanning v. Superior Court*, 320 A.2d 343, 345 (Del. 1974)).
[20] *Dawson v. State*, 637 A.2d 57, 62 (Del. 1994).

8

(10) We first observe that the specific arguments which Ray makes on appeal were not made at trial. The stated basis for the mistrial motion was the prosecutor's conduct in abruptly interrupting her direct examination of Lee, turning and looking at the spectator who had just entered, and requesting a side bar. When the motion for a mistrial was made and the alternative of conducting *voir dire* was added, counsel did say that a jury "concerned about their safety" is not a jury that is "going to be amenable to listening to arguments that he is not guilty."[21] But the specific arguments arising from the *voir dire* of Juror No. 11 and Alternative No. 3 were not made at trial. According to the record, after *voir dire* of the two jurors was completed, the trial judge did not offer, and defense counsel did not request, an opportunity to add any argument based on the jurors' responses.

(11) In *Dutton v. State*, we recognized that "[d]emeanor plays a very important role in determining impartiality, and thus this determination is particularly within the province of the Trial Judge."[22] We recognized this principle again in *Hughes v. State*, where we stated that "[b]ecause demeanor plays a crucial role in the determination of impartiality, the trial judge is in a unique position to evaluate jurors' assurances of impartiality."[23] While Juror No. 11's comments about the movie, "The Juror," and wondering about getting "shot in my car" are obviously

---

[21] App. to Appellant's Opening Br. at 161.
[22] 452 A.2d 127, 137 (Del. 1982).
[23] 490 A.2d 1034, 1041 (Del. 1985).

9

troubling, the trial judge was in the best position to assess the weight and seriousness to be given the juror's comments as she observed the juror's demeanor. Three times later in the examination the juror indicated she could be impartial. The "Yes" answer the juror gave when asked whether her concerns made her "more or less likely to find the defendant guilty or not guilty" is ambiguous because of the awkward nature of the question. The answer was clarified in the next and final question in which she clearly indicated she could be impartial. The trial judge was in the best position to judge the credibility of the juror's responses. We also think it significant that neither the State nor the defense requested that Juror No. 11 be removed for cause and replaced by an alternate. It is not uncommon for the State or a defendant to ask to have a juror removed and replaced by an alternate if circumstances arise during trial which call a juror's impartiality into question. Alternates were available in this case.

(12) Ray's argument that the examinations of Juror No. 11 and Alternate No. 3 show that the trial proceedings in the context of juror safety were being discussed among the entire jury, and that a mistrial should have been granted for that reason, is also unpersuasive. Ray infers from Juror No. 11's use of the word "we" several times in her first response that there was a general discussion going on among the jurors concerning safety and/or security. However, when asked whether she had discussed her concerns with other jurors, her only response was that she had asked the bailiff in the presence of the other jurors what was going on. Juror No. 11 never

10

actually said that any discussion with other jurors took place. Alternate No. 3 clearly said that no general discussion of the "presence of police officers or frequency of recess or anything" took place in her presence.[24] Defense counsel did not raise this issue after hearing the *voir dire* of both jurors, express any dissatisfaction with the *voir dire*, or renew his request that additional jurors be examined.

(13) On this record, we conclude that the trial judge's decision to deny the motion for a mistrial was not an abuse of discretion.

(14) Ray also contends, for the first time on appeal, that the trial court denied his Sixth Amendment right to a fair trial by failing to give a contemporaneous cautionary instruction on the presumption of innocence and admonition to the jury to refrain from discussing the case prior to deliberations. Ray argues that following the trial court's examination of Juror No. 11 and Alternate No. 3, "a situation was created where inferences of danger would be held against Ray to which the court's response was an insufficient counter and the universal jury misconduct was allowed to continue."[25] Because this claim was not fairly presented to the trial court, we review for plain error.[26] "Under the plain error standard of review, the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the

---

[24] App. to Appellant's Opening Br. at 163.

[25] Appellant's Opening Br. at 28.

[26] *Zhurbin v. State*, 104 A.3d 108 (Del. 2014).

11

fairness and integrity of the trial process."[27] "[T]he doctrine of plain error is limited to material defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice."[28] There is no such error, here.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is **AFFIRMED.**

BY THE COURT:

James T. Vaughn

Justice

---

[27] *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986).
[28] *Id.*

12